IN THE UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

TIQUAN HAMILTON,

                PLAINTIFF,

  -versus-

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-9,"
NEW YORK CITY POLICE OFFICER VITALIANO, J.
TREVOR BARTON,

           DEFENDANTS.

INDEX NO.

COMPLAINT
[JURY TRIAL
DEMANDED]

POLLAK, M.J

1. Plaintiff TIQUAN HAMILTON, by his attorneys, STECKLOW, COHEN AND THOMPSON, complaining of the defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

2. Plaintiff TIQUAN HAMILTON brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

3. On Wednesday, May 16, 2012 at or around 8:00 PM, Plaintiff TIQUAN HAMILTON was learning to ride a motorcycle from his brother-in law, pursuant to a valid learner's permit, when both he and his brother-in-law were pulled over by police without apparent justification. When TIQUAN HAMILTON tried to speak with police regarding the dubious justification for the stop, he was assaulted and battered by multiple police officers, and taken into custody. He was released with a desk appearance ticket early the next morning, and was eventually charged with resisting arrest and various vehicle-related charges, which were all dismissed and sealed after TIQUAN HAMILTON tendered evidence showing that the vehicle-related charges were entirely without merit. Plaintiff TIQUAN HAMILTON now brings this action seeking answers and vindication for his false arrest and injuries at the hands of the Defendants herein.

## JURISDICTION

4. This action is brought pursuant to 42 U.S.C.§§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred

upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

5. Plaintiff TIQUAN HAMILTON further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## VENUE

6. Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the events giving rise to this action occurred in this district.

## JURY DEMAND

7. Plaintiff TIQUAN HAMILTON respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## THE PARTIES

8. At all times pertinent to this complaint, Plaintiff TIQUAN HAMILTON was a resident of the City of New York, State of New York, and the County of Kings.

9. Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

10. Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

11. That at all times hereinafter mentioned, the Defendant Police Officers "JOHN DOES 1-9" and Defendant Police Officer TREVOR BARTON (collectively "Defendant POLICE OFFICERS" or individually "Defendant POLICE OFFICER") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

12. The identities of the Defendant "John Does" POLICE OFFICERS at issue here are unknown to Plaintiff TIQUAN HAMILTON at this time.

13. Plaintiff TIQUAN HAMILTON will amend this complaint to name the Defendant POLICE OFFICERS as their identities become available to Plaintiff TIQUAN HAMILTON.

14. That at all times hereinafter mentioned the Defendant POLICE OFFICERS were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

15. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by Defendant THE CITY OF NEW YORK.

16. Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by Defendant THE CITY OF NEW YORK.

## FACTS COMMON TO ALL CLAIMS

17. Plaintiff TIQUAN HAMILTON is a twenty-four (24) year-old male who resided in Brooklyn, New York at the time of the incident giving rise to this action.

18. Plaintiff TIQUAN HAMILTON is a married working father of two children.

19. At the time of the incident giving rise to this action, Plaintiff TIQUAN HAMILTON had recently acquired his New York motorcycle driver learner's permit.

20. Plaintiff TIQUAN HAMILTON was learning to drive a motorcycle from his brother-in-law, a licensed motorcycle driver.

21. Plaintiff TIQUAN HAMILTON possessed a motorcycle with valid license plates, valid registration, and valid insurance at the time of the incident.

22. Plaintiff TIQUAN HAMILTON purchased his motorcycle used from a motorcycle dealer in Queens New York, and the rear motorcycle license plate was in a dealer frame that obscured no parts of the motorcycle license plate number or registration sticker for same.

23. Both TIQUAN HAMILTON and his brother-in-law are African-Americans who present as black.

24. The events herein described began at or around 8:00 PM on May 16, 2012 in Brooklyn, New York.

25. On the evening of May 16, 2012, Plaintiff TIQUAN HAMILTON was receiving a motorcycle driving lesson from his brother-in-law on the street in front of his home in Brooklyn, New York.

26. New York motorcycle learner's permits issued to persons over the age of 18, such as TIQUAN HAMILTON, have no time restrictions on their use; *inter alia*, learners must be

accompanied by a licensed driver, such as TIQUAN HAMILTON's brother-in-law, and must avoid bridges, tunnels, and certain highways.

27. TIQUAN HAMILTON was not on a designated proscribed highway, or on a bridge or in a tunnel at the time of the incident.

28. TIQUAN HAMILTON was in compliance with all conditions of his learners permit at the time of the incident giving rise to this action.

29. At the time of the incident giving rise to this action, Plaintiff TIQUAN HAMILTON and his brother-in-law were approaching a stop light within a few blocks of TIQUAN HAMILTON's home when they observed police lights.

30. Plaintiff TIQUAN HAMILTON and his brother-in-law pulled over their motorcycles.

31. One or more Defendant POLICE OFFICERS approached Plaintiff TIQUAN HAMILTON and his brother-in-law.

32. One or more Defendant POLICE OFFICERS had their guns drawn at this time.

33. Plaintiff TIQUAN HAMILTON felt frightened and nervous due to the Defendant POLICE OFFICERS brandishing their firearms.

34. One or more Defendant POLICE OFFICERS demanded Plaintiff TIQUAN HAMILTON's license and registration, and Plaintiff TIQUAN HAMILTON provided same.

35. Plaintiff TIQUAN HAMILTON inquired as to why he had been stopped.

36. One or more of the Defendant POLICE OFFICERS stated, in sum and substance, that there had been motorcycle thefts in the area that they were investigating.

37. Plaintiff TIQUAN HAMILTON was disappointed and annoyed to realize that the Defendant POLICE OFFICERS apparently suspected him of being on a stolen motorcycle simply because he was a young black man on a motorcycle.

38. Plaintiff TIQUAN HAMILTON pointed out that the Defendant POLICE OFFICERS could see from his papers that his motorcycle was registered in his name.

39. After a time, Plaintiff TIQUAN HAMILTON asked whether he was free to go, stating in sum and substance that he had not done anything and could he please be on his way.

40. In response, one or more of the Defendant POLICE OFFICERS ordered TIQUAN HAMILTON to dismount from his motorcycle.

41. As Plaintiff TIQUAN HAMILTON moved to comply, one or more Defendant POLICE OFFICERS seized him without apparent cause or justification, and pulled him off his motorcycle.

42. Plaintiff TIQUAN HAMILTON did not resist in any way.

43. Plaintiff TIQUAN HAMILTON had made no offensive movements, and had not attempted to strike, push, grab, or otherwise physically resist any of the Defendant POLICE OFFICERS.

44. Nevertheless, Plaintiff TIQUAN HAMILTON was grabbed, punched, kicked and pushed by Defendant POLICE OFFICERS.

45. On information and belief, one or more Defendant POLICE OFFICERS knew or should have known at that time that excessive force was being employed against Plaintiff TIQUAN HAMILTON by one or more Defendant POLICE OFFICERS.

46. On information and belief, no Defendant POLICE OFFICERS intervened to prevent excessive force from being employed against Plaintiff TIQUAN HAMILTON by one or more of the Defendant POLICE OFFICERS, despite having had a realistic opportunity to do so.

47. Plaintiff TIQUAN HAMILTON suffered pain and injuries due to the conduct of the Defendant POLICE OFFICERS.

48. Plaintiff TIQUAN HAMILTON did not resist the Defendant POLICE OFFICERS assault on him in any way.

49. One or more of the Defendant POLICE OFFICERS pushed Plaintiff TIQUAN HAMILTON's motorcycle off its kick stand, causing it to fall on the ground.

50. Plaintiff TIQUAN HAMILTON's motorcycle was damaged due to the acts of the Defendant POLICE OFFICERS.

## POST-ARREST

51. Plaintiff TIQUAN HAMILTON was handcuffed and transported to a police precinct.

52. Plaintiff TIQUAN HAMILTON was fingerprinted and photographed.

53. Plaintiff TIQUAN HAMILTON was held at the police precinct for a number of hours.

54. At or around 3:00 A.M. on May 17, 2012, Defendant POLICE OFFICER TREVOR BARTON issued Plaintiff TIQUAN HAMILTON a desk appearance ticket, directing him to appear in court on June 19, 2012, on a top count of Obstruction of Governmental Administration in the Second Degree, a Class A Misdemeanor under NY PL §195.05.

55. Plaintiff TIQUAN HAMILTON went to a hospital and received treatment for his injuries following his release from police custody.

56. On June 19, 2012, Plaintiff TIQUAN HAMILTON went to court as directed by his Desk Appearance Ticket, and was informed that no paperwork had been filed in support of same.

57. Plaintiff TIQUAN HAMILTON was told to leave the court, and to await paperwork regarding a new court date, if any.

58. Thereafter, on July 10, 2012, TIQUAN HAMILTON filed a complaint with the New York City Civilian Complaint Review Board ("CCRB") regarding the excessive force and false arrest that he suffered at the hands of the Defendant POLICE OFFICERS in the incident described above.

59. On or about July 27, 2012, TIQUAN HAMILTON was notified that a new court date had been scheduled for his Desk Appearance Ticket for July 31, 2012.

60. On July 31, 2012, Plaintiff TIQUAN HAMILTON was arraigned on charges of Resisting Arrest, a Class A Misdemeanor, Improper Display of Plates under VTL §401(1)(B), Displaying Improper Number Plates under VTL §402(4), and Unlicensed Operator [sic] under VTL §509(1).

61. None of the above charges appeared on the Desk Appearance Ticket issued to TIQUAN HAMILTON on May 17, 2012.

62. None of the above charges have merit.

63. Plaintiff TIQUAN HAMILTON was in possession of a valid learner's permit and valid, properly displayed motorcycle license plates at the time of the incident giving rise to this action.

64. Plaintiff TIQUAN HAMILTON did not resist arrest or obstruct governmental administration in any way at the time of his arrest.

65. On information and belief, desk appearance tickets cannot be issued for resisting arrest under New York City Police Department policy.

66. On information and belief, Plaintiff TIQUAN HAMILTON was not processed and arraigned at the time of his arrest for resisting arrest because he did not resist arrest.

67. Plaintiff TIQUAN HAMILTON returned to Court on October 9, 2012.

68. Following this October 9, 2012 appearance, Counsel for Plaintiff TIQUAN HAMILTON provided photographs of TIQUAN HAMILTON'S learners permit and license plates to the Kings County District Attorney's Office.

69. Plaintiff TIQUAN HAMILTON returned to Court on November 5, 2012.

70. Based on the showing that TIQUAN HAMILTON had a valid learners permit and valid, properly displayed license plates at the time of his arrest by the Defendant POLICE OFFICERS, on November 5, 2012, the prosecution moved for an Adjournment in Contemplation of Dismissal of all charges against TIQUAN HAMILTON, with immediate sealing.

71. On November 5, 2012, all charges against TIQUAN HAMILTON were dismissed and sealed.

72. Due to his pending charges, Plaintiff TIQUAN HAMILTON was unable to apply for seasonal work as a security guard until late in the hiring process.

73. Upon information and belief, it is common practice among NYPD officers to arrest people even in the absence of actual belief a crime is being committed.

74. On information and belief, it is common practice among NYPD officers to arrest people for personal vindication following instances of perceived "contempt of cop," even in the absence of actual belief a crime is being committed.

75. On information and belief, it is common practice among NYPD officers to arrest people to meet quantitative performance goals, or arrest quotas, even in the absence of actual belief a crime is being committed.

76. On information and belief, it is common practice among NYPD officers to arrest people on "cover charges" following police employment of excessive force, to justify said use of force, even in the absence of actual belief a crime is being committed.

77. Information supporting the existence of the above-referenced abuses of "contempt of cop" charges, "cover charge" charges, and "arrest quotas" are pled in detail below, in the appendix hereto titled ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS, which is incorporated by reference herein.

78. Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by New York City Police Officers include resisting arrest, and obstruction of governmental administration.

79. Upon information and belief, "contempt of cop" and "cover charge" charges such as resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

80. Upon information and belief, "contempt of cop" and "cover charge" charges such as resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence or witness observation of criminal acts.

81. Upon information and belief, the charges proffered against Plaintiff TIQUAN HAMILTON were "cover-charges" brought in order to justify the illegal "Contempt of Cop" arrest made by the Defendant POLICE OFFICERS.

82. Upon information and belief, the charges proffered against Plaintiff TIQUAN HAMILTON were "cover-charges" brought in order to justify the illegal use of excessive force by the Defendant POLICE OFFICERS against Plaintiff TIQUAN HAMILTON.

83. The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because Plaintiff TIQUAN HAMILTON'S arrest was undertaken in the absence of probable cause to arrest.

84. The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because it was undertaken in a manner which indicated that the individual Defendant POLICE OFFICERS who participated in Plaintiff TIQUAN

HAMILTON'S arrest made the determination to arrest Plaintiff TIQUAN HAMILTON (months) before determining why Plaintiff TIQUAN HAMILTON should be arrested.

85. The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests, because the Defendant POLICE OFFICERS arrested and initiated criminal proceedings against Plaintiff TIQUAN HAMILTON after it was already established that Plaintiff TIQUAN HAMILTON was not engaged in illegal conduct of any kind, let alone the kinds alleged by Defendant POLICE OFFICERS just before the time of his arrest, but after Plaintiff TIQUAN HAMILTON had been seized and assaulted by the Defendant POLICE OFFICERS.

86. Upon information and belief, the arrest of Plaintiff TIQUAN HAMILTON was motivated wholly by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

87. Upon information and belief, the arrest of Plaintiff TIQUAN HAMILTON was motivated in part by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

88. Upon information and belief, the arrest of Plaintiff TIQUAN HAMILTON was motivated wholly by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK'S police department.

89. Upon information and belief, the arrest of Plaintiff TIQUAN HAMILTON was motivated in part by the Defendant Police Officers' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK'S police department.

90. The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because it was undertaken in the absence of probable cause to arrest.

91. The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because it was undertaken in a manner which indicated that the individual Defendant POLICE OFFICERS who participated in Plaintiff TIQUAN HAMILTON'S arrest made the determination to arrest Plaintiff TIQUAN HAMILTON before determining why Plaintiff TIQUAN HAMILTON should be arrested.

92. The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because it was undertaken in a manner which indicated that the individual Defendant POLICE OFFICERS who participated in Plaintiff TIQUAN HAMILTON'S arrest falsely averred that Plaintiff TIQUAN HAMILTON was (1) driving without legal sanction; (2) driving with improper license plates; and (3) improperly displaying said license plates,

when it would have been clear to any reasonable observer that none of the above averments were true.

93. As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

94. Plaintiff TIQUAN HAMILTON repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

95. All of the aforementioned acts of the Defendant CITY, and the Defendant POLICE OFFICERS their agents, servants and employees, were carried out under the color of state law.

96. All of the aforementioned acts deprived Plaintiff TIQUAN HAMILTON of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

97. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

98. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

99. The Defendant POLICE OFFICERS and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

100. Further information regarding the existence of the aforesaid constitutionally-violative customs, policies and practices of Defendant CITY OF NEW YORK and its police officers, as well as of Defendant CITY OF NEW YORK'S knowledge of same and

Defendant CITY OF NEW YORK'S failures to address same are set forth in the appendix to this complaint.

101.     As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

102.     As a result of Defendants' impermissible conduct, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

103.     Plaintiff TIQUAN HAMILTON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

104.     As a result of the aforesaid conduct by Defendants, Plaintiff TIQUAN HAMILTON was subjected to an illegal, improper and false arrest by the Defendant POLICE OFFICERS and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

105.     As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

106.     As a result of Defendants' impermissible conduct, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

107.     Plaintiff TIQUAN HAMILTON repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

108.     Some or all of the Defendant POLICE OFFICERS assaulted Plaintiff TIQUAN HAMILTON in the absence of need for such action and force.

109.    Some or all of the Defendant POLICE OFFICERS subjected Plaintiff TIQUAN HAMILTON to several physically aggressive maneuvers without Defendants identifying a requisite need for such action and force.

110.    The level of force employed by some or all of the Defendant POLICE OFFICERS against Plaintiff TIQUAN HAMILTON was objectively unreasonable.

111.    The force employed by some or all of the Defendant POLICE OFFICERS against Plaintiff TIQUAN HAMILTON did not advance any proper government objective.

112.    As a result of the aforementioned conduct of defendants, Plaintiff TIQUAN HAMILTON was subjected to excessive force and sustained physical injuries.

113.    As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

114.    As a result of Defendants' impermissible conduct, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

115.    Plaintiff TIQUAN HAMILTON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

116.    The Defendant POLICE OFFICERS had an affirmative duty to intervene on Plaintiff TIQUAN HAMILTON'S behalf to prevent the above-referred violations of his constitutional rights.

117.    The Defendant POLICE OFFICERS failed to intervene on Plaintiff TIQUAN HAMILTON'S behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

118.    The Defendant POLICE OFFICERS failed to intervene on Plaintiff TIQUAN HAMILTON'S behalf to prevent the violation of his constitutional rights, despite having substantially contributed to the circumstances within which Plaintiff TIQUAN HAMILTON'S rights were violated by their affirmative conduct.

119.    As a result of the aforementioned conduct of the individual defendants, Plaintiff TIQUAN HAMILTON'S constitutional rights were violated.

120.    As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

121.    As a result of Defendants' impermissible conduct, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## RETALIATION FOR FIRST AMENDMENT PROTECTED EXPRESSION
## UNDER 42 U.S.C. § 1983

122.    Plaintiff TIQUAN HAMILTON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

123.    At or around the time that Plaintiff came into contact with the Defendant POLICE OFFICERS, Plaintiff TIQUAN HAMILTON engaged in protected speech or conduct, including but not limited to asking questions and protesting the manner in which he was being treated by the Defendant POLICE OFFICERS.

124.    Defendant POLICE OFFICERS took adverse action against Plaintiff TIQUAN HAMILTON.

125.    Defendant POLICE OFFICERS took adverse actions against Plaintiff TIQUAN HAMILTON by using wrongful and unjustified force upon Plaintiff.

126.    Defendant POLICE OFFICERS took adverse action against Plaintiff TIQUAN HAMILTON by unlawfully arresting him without probable cause.

127.    Defendant POLICE OFFICERS took adverse action against Plaintiff TIQUAN HAMILTON by falsely accusing him of crimes and violations.

128.    Defendant POLICE OFFICERS took adverse action against Plaintiff TIQUAN HAMILTON by taking Plaintiff into Police custody and detaining him against his will.

129.    Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiff TIQUAN HAMILTON and the adverse actions taken by the Defendant POLICE OFFICERS.

130.    The causal connection between the protected speech and conduct engaged in by Plaintiff TIQUAN HAMILTON and the adverse actions taken against Plaintiff by Defendant POLICE OFFICERS was demonstrated by, among other things, the fact that

the Defendant POLICE OFFICERS used excessive force against Plaintiff TIQUAN HAMILTON in the absence of justification.

131.    The causal connection between the protected speech and conduct engaged in by Plaintiff TIQUAN HAMILTON and the adverse actions taken against Plaintiff by Defendant POLICE OFFICERS was demonstrated by, among other things, the absence of probable cause justifying Plaintiff TIQUAN HAMILTONS' arrest.

132.    The Plaintiff was falsely accused of crimes and violations and was taken into Police custody and detained against his will.

133.    Following his arrest, Plaintiff TIQUAN HAMILTON was subject to prosecution.

134.    The above-described charges were a pretext intended to justify the Plaintiff's illegal arrest.

135.    The actions of the Defendant POLICE OFFICERS heretofore described, constituted unlawful detention, imprisonment, assault and battery and were designed to and did cause bodily harm, pain and suffering both in violation of the Plaintiffs' constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the constitution of the State of New York and in direct retaliation for the Plaintiff's exercise of their civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

136.    That the conduct and actions of Defendants POLICE OFFICERS acting under color of State law, in assaulting, detaining and imprisoning the Plaintiff were done intentionally, maliciously, and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful justification, and were designed to and did cause bodily harm, pain and suffering both in violation of the Plaintiff's constitutional rights as guaranteed under 42 U.S.C. §1983, the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for the Plaintiff's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

137.    The Defendant POLICE OFFICERS deprived the Plaintiff of his liberty in violation of both his civil and constitutional rights, as guaranteed under 42 U.S.C. §1983 and set forth in the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for the Plaintiff's exercise of his civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

138.     Defendants' actions were undertaken under color of law and would not have existed but for Defendants using their official power.

139.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff TIQUAN HAMILTON.

140.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiff TIQUAN HAMILTON'S constitutional rights.

141.     All of the foregoing acts by Defendants deprived Plaintiff TIQUAN HAMILTON of federally protected rights, including, but not limited to, the right:

A. Not to be deprived liberty without due process of law;
B. To be free from seizure and arrest not based upon probable cause;
C. To free expression; and
D. To receive equal protection under the law.

142.     As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

143.     As a result of Defendants' impermissible conduct, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.


### SIXTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL*

144.     Plaintiff TIQUAN HAMILTON repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

145.     Plaintiff also incorporates herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

146.     Defendants used excessive force on Plaintiff TIQUAN HAMILTON in the absence of any evidence of criminal wrongdoing or other justification for the use of such force, notwithstanding their knowledge that said uses of force were unreasonable, unjustified,

and would jeopardize Plaintiff TIQUAN HAMILTON'S liberty, well-being, safety and constitutional rights.

147.    Defendants arrested and incarcerated Plaintiff TIQUAN HAMILTON in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiff TIQUAN HAMILTON'S liberty, well-being, safety and constitutional rights.

148.    The acts complained of were carried out by the aforementioned individua Defendant POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

149.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

150.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

    a. the continuing practice or custom of New York City Police Officers utilizing disproportionate force in a punitive, retaliatory or otherwise wrongful manner in interactions with civilians generally;

    b. the continuing practice or custom of New York City Police Officers utilizing disproportionate force in a punitive, retaliatory or otherwise wrongful manner in interactions with minorities;

    c. the continuing practice or custom of New York City Police Officers wrongfully arresting individuals for perceived "contempt of cop";

    e. the continuing policy of quantitative enforcement goals, or arrest quotas, which cause New York City Police Officers to wrongfully arrest persons in the absence of probable cause in order to avoid negative career consequences for not meeting said arrest quotas;

    f. the continuing practice of failing to properly screen, supervise, discipline, transfer, counsel, or otherwise control police officers engaged in the excessive use of force or in warrantless or otherwise unconstitutional arrests or otherwise impermissible violations of individuals' constitutional rights, particularly with respect to officers who are repeatedly accused of such acts;

    g. the custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence," wherein members of the New York City Police Department intentionally and willfully fail to cooperate with investigations into the misconduct or corrupt activities of their fellow officers, a practice which leads New York City Police Officers to regularly condone and cover up police abuse of power by telling false and incomplete stories.

151.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department evince deliberate indifference to the safety, well-being, and constitutional rights of Plaintiff TIQUAN HAMILTON.

152.    As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss or property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

153.    As a result of Defendants' impermissible conduct, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## EQUAL PROTECTION UNDER 42 U.S.C. § 1983

154.    Plaintiff TIQUAN HAMILTON repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

155.    Plaintiff also incorporates herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

156.    At all times described herein, Plaintiff TIQUAN HAMILTON was possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

157.    The Defendant POLICE OFFICERS arrested and incarcerated Plaintiff TIQUAN HAMILTON in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiff's liberty, well-being, safety and constitutional rights.

158.    The acts complained of were carried out by the aforementioned individual Defendant POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

159.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

160.    Plaintiff TIQUAN HAMILTON was taken into Police custody and detained against his will overnight.

161.    That the actions of the Defendant POLICE OFFICERS heretofore described, constituted unlawful detention, imprisonment, assault and battery and malicious prosecution and were designed to and did cause specific bodily harm, pain and suffering both in violation of Plaintiff TIQUAN HAMILTON'S Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for Plaintiff TIQUAN HAMILTON'S exercise of his civil and constitutional rights of free expressive association as guaranteed by the Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

162.    The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals.

163.    The particular arrest of Plaintiff TIQUAN HAMILTON is believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals, because one or more of the Defendant POLICE OFFICERS arrested Plaintiff TIQUAN HAMILTON after it was already established that Plaintiff TIQUAN HAMILTON was not carrying any weapons or illegal substances, did not have any outstanding warrants against him, and was not engaged in illegal conduct of any kind just before the time of his arrest.

164.    The Defendant POLICE OFFICERS, through their actions, carried out a discriminatory application of such laws, driven by a discriminatory motivation of what might otherwise be facially neutral statutes due to a perceived ease of prosecution.

165.    As a result of the aforementioned conduct, the Defendant POLICE OFFICERS have violated Plaintiff TIQUAN HAMILTON'S constitutional rights to equal protection, and Plaintiff TIQUAN HAMILTON is entitled to seek redress under 42 U.S.C. §1983, and is further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

166.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by Plaintiff TIQUAN HAMILTON as alleged herein.

167.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the moving force

behind the constitutional violations suffered by Plaintiff TIQUAN HAMILTON as alleged herein.

168.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiff TIQUAN HAMILTON was subjected to excessive force, false arrest, and excessive and unnecessary detention.

169.    As a result of the above constitutionally impermissible conduct, Plaintiff TIQUAN HAMILTON was caused to suffer, *inter alia*, personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, loss of wages, legal expenses, and damage to his reputation and standing within his community.

170.    As a result of the foregoing, Plaintiff TIQUAN HAMILTON demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

     I. Invoke pendent party and pendent claim jurisdiction.

     II. Award appropriate compensatory and punitive damages.

     III. Award appropriate declaratory and injunctive relief.

     IV. Empanel a jury.

     V. Award attorney's fees and costs.

     VI. Award such other and further relief as the Court deems to be in the interest of justice.

DATED:  New York, New York
        April 10, 2013

Respectfully submitted,

SAMUEL B. COHEN [SC 7406]
STECKLOW COHEN & THOMPSON
10 SPRING ST, SUITE 1
NEW YORK, NY 10012
[212] 566-8000
[212] 202-4952/FAX
ATTORNEYS FOR PLAINTIFF

## APPENDIX: ADDITIONAL FACT PLEADINGS
## IN SUPPORT OF MONELL CLAIMS

### "CONTEMPT OF COP" AND "COVER CHARGE" ARRESTS

1.    Upon information and belief, Defendant CITY OF NEW YORK has had notice of, and tacitly condoned, its police officers' proffering of pretextual and false charges for personal vindication and/or to putatively justify improper uses of force against civilians.

2.    In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

3.    On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[1]

4.    The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008.  See fn1.

5.    In response to Seattle Police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in… his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.'  'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'"  See fn1.

6.    In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33…%) of resisting arrest cases brought by San Jose police, a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[2]

---

[1] Nalder, Kamb and Lathrop, "*Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate*," Seattle Post-Intelligencer,  February 28, 2008.  Article incorporated herein by reference.

[2] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases," San Jose Mercury News, October 31, 2009.  Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1

7.    The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. See fn2.

8.    In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. See fn2.

9.    A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[3]

10.    A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City Police Officers were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." See fn3.

11.    The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997. See fn3.

12.    Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

13.    Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with

---

[3] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A961958260&sc p=8&sq=contempt+of+cop&st=cse&pagewanted=all.

crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

14. Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant POLICE OFFICERS have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

15. Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations for personal vindication and/or as pretexts to justify use of force, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges.

16. Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges.

17. Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant POLICE OFFICERS have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

## THE PRACTICES AND CUSTOMS OF THE NEW YORK CITY POLICE DEPARTMENT ENABLE ITS OFFICERS TO ENGAGE IN POLICE BRUTALITY AND USE OF EXCESSIVE FORCE WITHOUT MEANINGFUL OVERSIGHT

**18.** Upon information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons and persons' property.

**19.** In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

**20.** On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[4]

**21.** The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS." The Report at page before "i."

**22.** The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant CITY OF NEW YORK, and therefore knowledge of its contents may be imputed to Defendant CITY OF NEW YORK.

**23.** The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence.

**24.** The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

**25.** One police officer who testified before the Mollen Commission explained that the code of silence "...starts in the Police Academy, and it just develops from there.... It starts with the instructors telling you never to be a rat, never give up your fellow officer. It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go... into a precinct." The Report at 55.

---

[4] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York. Incorporated by reference herein and available online at http://www.parc.info/client_files/Special Reports/4 - Mollen Commission - NYPD.pdf.

26.   Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops. And if they did tell on them, just say if a cop decided to tell on me, his career's ruined. He's going to be labeled as a rat.... he's going to have nobody to work with. And chances are if it comes down to it... [the whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

27.   A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat... you're going to have a difficult time for the remainder of your career.... [i]t was something that you couldn't shake." Id. at 54.

28.   An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

29.   An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his career, and in almost every case "he found evidence that his reputation had preceded him. At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

30.   The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

31.   The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

32.   The *Mollen Commission* found that "[police b]rutality is... used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

33.   One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance. It's not simply giving a beating. It's the other officers begin [sic] to accept you more." Id.

34.   The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence.... [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the... [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse." The Report at 49.

35.   As of the July 7, 1994 *Mollen Commission Report,* Defendant CITY OF NEW YORK had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of

themselves and their fellow officers, including brutal conduct like that which was perpetrated by Defendant POLICE OFFICERS upon Plaintiff TIQUAN HAMILTON.

36. Upon information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

37. Upon information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

38. The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[5]

39. Research for this report was conducted over two and a half years, from late 1995 through early 1998. See fn5.

40. The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." See Id.

41. The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. See Id.

42. The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. See Id.

43. Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

---

[5] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998. Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human Rights Watch/uspohtml/

**44.** Upon information and belief, the Mayor denounced the report without reading it.

**45.** Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

**46.** Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

**47.** That the Defendant CITY OF NEW YORK continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

    a. **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers.... [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

    b. **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996) ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

    c. **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

    d. **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence.... Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

e. **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful.... [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

48. Upon information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

49. Upon information and belief, the policymakers of the NYPD and Defendant CITY OF NEW YORK are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

50. Defendant CITY OF NEW YORK has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

51. In the introduction to the Mollen Commission Report, it is noted that "the [Internal Affairs] system designed to protect the [New York City Police] Department from corruption minimized the likelihood of uncovering it." The Report at 3.

52. The Mollen Commission Report explained that at that time, the Internal Affairs Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to close cases with as little effort as possible.... One officer told us they sit around and 'eat donuts and do crossword puzzles' -- and the supervisors and commanders did little more.... an anonymous survey of the work conditions and attitudes of IAD investigators... revealed that almost half of IAD investigators' time was spent on non-investigatory matters -- and more of their 'investigative' work was done without ever leaving their office.... The facts confirmed IAD's do-nothing reputation." The Report at 85

53. Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available. *NYPD Internal Affairs 2006 Annual Report*, 12-13.[6]

---

[6] 1993-2006 Internal Affairs Reports available online at http://www.nyc.gov/html/ccpc/downloads/pdf/performance_monitoring_april_2006.pdf.

**54.** Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id.*

**55.** Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

**56.** Defendant CITY OF NEW YORK has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

**57.** Upon information and belief, Defendant CITY OF NEW YORK has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**58.** Defendant CITY OF NEW YORK has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**59.** This is not a new phenomenon; in <u>Sango v. New York</u>, 1989 U.S. Dist. LEXIS 18214, 40-41 (S.D.N.Y. June 19, 1989), the court found that CCRB investigations into police misconduct were so grossly inadequate that "their predictable results could have led... officers to believe that their conduct, no matter how improper, would go unpunished."

**60.** That Defendant CITY OF NEW YORK had knowledge of its continuing failure to abate the above-referred practices and customs can be shown with reference to the following facts reported to the City in the *2006 Annual Report* of the CCRB:[7]

  a. Only 12,059 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 received full investigations. *CCRB 2006 Annual Report*, 93.
  b. Only 1,441 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 resulted in a finding of even one substantiated allegation. *Id.*
  c. The NYPD either took no disciplinary action whatsoever or merely issued instructions in 1,062 of the 1,918 cases of CCRB-substantiated police misconduct closed by the department between 2002 and 2006.

[7] 2001-2012 CCRB Reports available online at http://www.nyc.gov/html/ccrb/html/reports.html.

Some of these cases had been forwarded to the NYPD by the CCRB before 2002. *Id.* at 101.

d. In the five years between 2002 and 2006 only one (1) NYPD officer was subject to employment termination as a result of allegations of misconduct substantiated by the CCRB. *Id.* at 100.

e. The CCRB substantiated only 3.5% of the excessive force allegations reported between 2002 and 2006. *Id.* at 95.

61. The New York Civil Liberties Union report on the CCRB'S activities between 1994 and 2006, entitled "Mission Failure: Civilian Review of Policing in New York City 1994-2006" ("NYCLU Report")[8] reviewed, collated and summarized information from the CCRB'S Annual Reports and other sources, resulting in the following findings:

a. CCRB complaint data indicates that serious police misconduct, including improper threats and use of force, occurs with significant frequency, with allegations of excessive force in half of all complaints filed with the CCRB. NYCLU Report at 4.

b. The NYPD takes no disciplinary action whatsoever against nearly 30% of officers named in substantiated CCRB complaints, and gave only "instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005. Id. at 5.

c. "In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians. In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved." Id. at 6.

62. In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

63. In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the Defendant CITY OF NEW YORK knew or should have known that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

---

[8] Available online at http://www.nyclu.org/files/ccrb_failing_report_090507.pdf.

**64.** The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, *inter alia*, by the cases and reports cited above.

**65.** Upon information and belief, Defendant, CITY OF NEW YORK, and the New York City Police Department failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to the Defendant POLICE OFFICERS, as demonstrated by their propensity for group violence, including excessive use of force and restraint, and for their failure to protect citizens from unconstitutional conduct of other police officers.

**66.** Upon information and belief, Defendant CITY OF NEW YORK, failed to put into place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers. *Inter alia*, the structure was deficient at the time of pre-selection and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

**67.** The net effect of these deficiencies and failures was to permit police officers of the New York City Police Department to function at levels of significant and substantial risk to the public.

**68.** Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

**69.** Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

**70.** Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

## UNCONSTITUTIONAL ARREST QUOTAS ILLEGALLY IMPLEMENTED BY THE NEW YORK CITY POLICE DEPARTMENT

71. Upon information and belief, police officers in the New York City Police Department, including the Defendant POLICE OFFICERS are trained, ordered or encouraged to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK'S police department.

72. Said quantitative enforcement "productivity goals" can also be referred to as arrest quotas.

73. The need to meet arrest quotas can induce police officers to make arrests in the absence of probable cause.

74. Upon information and belief, the arrest quotas promulgated by Defendant CITY OF NEW YORK induce New York City police officers, such as the Defendant POLICE OFFICERS herein, to make arrests in the absence of probable cause, in violation of the constitutional rights of individuals to be free from unreasonable seizures.

75. The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in Bryant v. City of New York, Kings County Supreme Court Docket #022011/2007, found that the plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

76. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported by the media on November 8, 2010, that commanders are permitted to set "productivity goals."[9]

77. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn. See fn10.

78. Attached hereto as **Exhibit "A"** are copies of the quantitative target sheets obtained from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the aforesaid November 8, 2010 New York Daily News article.

79. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tapes recordings acquired by WABC-TV/DT, including, among other admissions, a 41st precinct sergeant explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as

---

[9] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

reported by the media on March 3, 2010.[10]

**80.**   The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make "special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[11]

**81.**   The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the full page color advertisement placed by the Patrolmen's Benevolent Association of the City of New York in the May 7, 2012 edition of the New York Daily News, which states "Don't Blame the Cop[,] Blame NYPD Management For the pressure to write summonses and the pressure to convict motorists[.]   Because of ticket quotas, New York City police officers are being pressured to write summonses to as many motorists as possible.... "   A reproduction of the advertisement in question is attached hereto as **Exhibit "B."**

**82.**   The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred to have continued to the present date from the opinion granting class certification in Floyd v. The City of New York, 08 Civ 1034 (SDNY May 16, 2012), in which the Honorable District Judge Shira A. Scheindlin noted the existence of a Police Officer Performance Objectives Operations Order dated October 17, 2011, in which "Commissioner Kelly directed all commands that 'Department managers **can** and **must** set performance goals,' relating to 'the issuance of summonses, the stopping and questioning of suspicious individuals, and the arrests of criminals.'"   Floyd Document 206 at 18-19, citing 10/17/11 Police Officer Performance Objectives Operations Order. (emphasis in original).

---

[10] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.
[11] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

DATED:  New York, New York
        April 12, 2013

Respectfully submitted,

SAMUEL B. COHEN [SC 7406]
STECKLOW COHEN & THOMPSON
10 SPRING ST, SUITE 1
NEW YORK, NY 10012
[212] 566-8000
[212] 202-4952/FAX
ATTORNEYS FOR PLAINTIFF

**EXHIBIT A**

GOOD DAY WE NEED THE FOLLOWING FOR
THE WEEK: 4/5-4/11

CELLPHONE    60
SEATBELTS    50
DBL PKS.     65
BUS STOPS    40
TINTS        25
TRUCK RTES   2

PLEASE HAVE SUMMONS ISSUED AT APL'S:
ST JOHNS SCHENECTADY
UTICA/ST MARKS
EPKWY/WASHINGTON
PARK/VANDERBILT
EPKWY/ALBANY
          *Please be advised these are new apl locations*

PLEASE ISSUE HANDICAPPED SUMMONS ON ALL TOURS

THANK YOU

10/18/10

FOR THE WEEK OF 10/18- 10/24 WE NEED:

DBL PKRS     25
BUS STOPS    15
SEATBLTS     50
CELLPHNS     75
TINTS         6
TRUCK RTE     5

Thank you,

# EXHIBIT B



# Don't Blame the Cop

## Blame NYPD Management

**For the pressure to write summonses and the pressure to convict motorists**

Because of ticket quotas, New York City police officers are being subjected to undue **pressure to write** summonses to as many motorists as possible. And for some reason, once the case gets to traffic court, they are being subjected to undue **pressure to convict** as many motorists as possible. In the first instance, the pressure comes in the form of lousy assignments, denial of transfer requests, unwanted transfers and other penalties. And in traffic court, where Internal Affairs supervisors are assigned for the sole purpose of punishing officers, the pressure comes from the risk of losing three vacation days — worth more than $900 — if the motorist is found not guilty. With all these pressures, the cop loses, the public loses and the traffic court justice system loses. The only winner may be the city's treasury, which collects either from the cop or the motorist.



**Patrolmen's Benevolent Association**
of the City of New York

125 Broad Street, 11th Floor, New York, NY 10004 • 212-233-5531

**Patrick J. Lynch, President**

**EXHIBIT A**

GOOD DAY WE NEED THE FOLLOWING FOR
THE WEEK: 4/5-4/11

CELLPHONE   60
SEATBELTS   50
DBL PKS.    65
BUS STOPS   40
TINTS       25
TRUCK RTES  2

PLEASE HAVE SUMMONS ISSUED AT APL'S:
ST JOHNS SCHENECTADY
UTICA/ST MARKS
EPKWY/WASHINGTON
PARK/VANDERBILT
EPKWY/ALBANY
          *Please be advised these are new apl locations*

PLEASE ISSUE HANDICAPPED SUMMONS ON ALL TOURS

THANK YOU

10/18/10

FOR THE WEEK OF 10/18- 10/24 WE NEED:

DBL PKRS     25
BUS STOPS    15
SEATBLTS     50
CELLPHNS     75
TINTS         6
TRUCK RTE     5

Thank you,

# EXHIBIT B



# Don't Blame the Cop



# Blame NYPD Management

### For the pressure to write summonses and the pressure to convict motorists

Because of ticket quotas, New York City police officers are being subjected to undue **pressure to write** summonses to as many motorists as possible. And for some reason, once the case gets to traffic court, they are being subjected to undue **pressure to convict** as many motorists as possible. In the first instance, the pressure comes in the form of lousy assignments, denial of transfer requests, unwanted transfers and other penalties. And in traffic court, where Internal Affairs supervisors are assigned for the sole purpose of punishing officers, the pressure comes from the risk of losing three vacation days — worth more than $900 — if the motorist is found not guilty. With all these pressures, the cop loses, the public loses and the traffic court justice system loses. The only winner may be the city's treasury, which collects either from the cop or the motorist.

**Patrolmen's Benevolent Association**
of the City of New York

125 Broad Street, 11th Floor, New York, NY 10004 • 212-233-5531
**Patrick J. Lynch, President**